# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| ) | Case No. 11-71142-SCS |
| ROBERT EDWARD SEATON, JR., ) | |
| SARAH NICHOLE SEATON, ) | |
| ) | |
| *Debtors*. ) | Chapter 7 |
| ) | |

## MEMORANDUM OPINION

This matter comes before the Court upon the Motion for Contempt against Collinswood Lake Apartments, LLC, George Eberwine, and Kittrell Eberwine and the Motion for Sanctions (collectively, the "Sanctions Motion") filed by Robert Edward Seaton, Jr., and Sarah Nichole Seaton on June 27, 2011. An evidentiary hearing was held on the Sanctions Motion on August 3, 2011. At the conclusion of the evidence and arguments, the Court took this matter under advisement. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

### I. The Seatons' Bankruptcy Petition and the Sanctions Motion

Robert Edward Seaton, Jr., and Sarah Nichole Seaton (collectively, the "Seatons") filed a joint voluntary petition under Chapter 7 of the United States Bankruptcy Code in this Court on March 14, 2011 ("Petition"). At the time of the filing of their Petition, the Seatons resided at 1607 City Park Avenue, Apartment 9 (the "Apartment"), in Portsmouth, Virginia, which is located in the Collinswood Lake Apartments complex owned by Collinswood Lake Apartments, LLC ("Collinswood"). In their Schedule B, which lists personal property, in addition to their bank

accounts, 2010 tax refunds, and a vehicle, the Seatons listed only the following personal property: "t.v. 50, sofa 50, loveseat 50, kitchen table 25, bed 50, dresser 25, crib 25, computer 50."  The property, designated as being jointly owned by the Seatons, is listed as having a cumulative value of $325.00.  No other personal property was scheduled.[1]  The Seatons' Schedule F of creditors holding unsecured nonpriority claims did not schedule either Collinswood, George Eberwine, or Kittrell Eberwine.  The Seatons' Schedule G of executory contracts and unexpired leases did list Collinswood as a party to a residential lease with the Seatons.  The Chapter 7 Trustee filed a Report of No Distribution on April 21, 2011.  On June 2, 2011, the Seatons filed an amendment to Schedule F, adding Collinswood as an unsecured creditor in the amount of $8,700.00.

The Seatons filed the Sanctions Motion on June 27, 2011.  In the Sanctions Motion, the Seatons allege that George Eberwine, as general partner of Collinswood, filed an unlawful detainer proceeding against the Seatons on March 10, 2011, in the General District Court for the City of Portsmouth, Virginia ("State Court") regarding the Apartment.  Four days later, the Seatons filed their Petition.  The Sanctions Motion further alleges that on March 28, 2011, George Eberwine and Mr. Seaton appeared in the State Court, at which time Mr. Seaton advised the State Court judge that he had filed the Petition in this Court.  The State Court judge continued the proceeding to April 4, 2011.  The Seatons allege further that on March 31, 2011, they signed a lease for a new apartment but were advised they could not move in until the utilities were turned on by them.  On April 2 or

---

[1] On March 23, 2011, the Seatons filed an Amended Schedule B, which amended the description of the tax refund to divide the ownership of the refund between the Seatons and reduced the amounts of the refunds.  Further, the description of the refund itself was changed to reference 2011, although such reference appears incorrect as the Seatons would not yet have incurred taxes or been eligible for a refund for the 2011 tax year.  The Seatons filed a second amendment to Schedule B on May 25, 2011, which added a $750.00 "rent deposit with landlord" as an asset.

3, 2011, the Seatons allege they began moving their possessions from the Apartment at Collinswood. On April 4, 2011, Mr. Seaton and George Eberwine reappeared before the State Court. The State Court judge continued the hearing to April 11, 2011, to allow the Seatons to conclude the moving process. Upon arriving at the Apartment on April 6, 2011, the Seatons allege they could not access the Apartment because the locks had been changed. The Seatons additionally allege that Mrs. Seaton walked to a nearby dumpster and discovered their personal property that had been placed therein, some of which was retrieved by Mr. Seaton. The Seatons also allege they were unable to account for some of their personal property that had remained in the Apartment. Finally, the Seatons allege Kittrell Eberwine ordered a maintenance worker employed at Collinswood to remove the Seatons' property from the Apartment and dispose of it. These actions, the Seatons contend, constitute a violation of the automatic stay under § 362 of the Bankruptcy Code, and they pray for a finding of contempt; sanctions; a monetary award for property damage; $20,000.00 for pain and suffering; an award of punitive damages of $30,000.00; and attorney's fees and costs.

In their joint Response to the Sanctions Motion, Collinswood, George Eberwine, and Kittrell Eberwine (collectively, the "Respondents") deny any liability to the Seatons and further deny that any of their actions violated the automatic stay. Instead, they argue that their actions were based upon George Eberwine's understanding of Mr. Seaton's representations to the State Court judge that he and Mrs. Seaton had vacated the Apartment. George Eberwine relayed his understanding to Kittrell Eberwine, who, after walking through the Apartment to assess its condition, instructed an employee of Collinswood to remove the items remaining therein. The Respondents assert that they believed the items left in the Apartment were abandoned by the Seatons based upon Mr. Seaton's representations to the State Court judge that the Apartment had been vacated, and thus, they did not

3

believe the pending bankruptcy proceedings prohibited them from disposing of the items.  The

Respondents maintain that, even if the Court finds that they violated the automatic stay, the violation

should not be deemed to be willful or intentional as they acted in good faith based upon Mr. Seaton's

representations.  Finally, the Respondents argue that, even if the Court finds the violation of the

automatic stay to be willful or intentional, the Seatons should not be awarded damages nor should

sanctions be assessed against the Respondents.

## II.  Findings of Fact

Much of the history of the Seatons' tenancy at Collinswood is uncontroverted.  The Seatons

previously lived at another apartment complex owned by George Eberwine without incident.

Transcript of August 3, 2011, hearing, at 4 (hereinafter, "Tr.").  The Seatons then moved to the

Apartment at Collinswood, *id.*, but fell behind in their rent payments in the fall of 2010 due to

unemployment and health problems suffered by Mr. Seaton.  *Id.* at 10, 93.  Various meetings

between George Eberwine and the Seatons took place, but the Seatons were unable to pay their rent

and eventually owed Collinswood five to six months rent.  *Id.* at 11.  On March 10, 2011, George

Eberwine initiated an unlawful detainer proceeding against the Seatons in the State Court seeking

possession of the Apartment and payment of the rent ("Unlawful Detainer").  *See* Seaton Exhibit D,

Summons for Unlawful Detainer, issued March 10, 2011.  The Seatons filed their Petition on March

14, 2011.

Mr. Seaton and George Eberwine appeared in State Court on the original return date for the

Unlawful Detainer of March 28, 2011 ("Original Return Date").  Tr. at 10, 87.  There is little

disagreement as to what occurred on the Original Return Date.  Mr. Seaton advised the State Court

of the pendency of his Petition.  *Id.* at 11, 88.  The State Court judge thereafter advised Mr. Seaton

and George Eberwine he was uncertain as to what relief could be granted because of the pendency of the Petition and, on his own motion, continued the Unlawful Detainer until April 4, 2011, one week hence ("Continued Hearing"). *Id*. at 11, 13, 88. George Eberwine was unaware of the Petition until the Original Return Date. *Id*. at 98; *see also id*. at 88. In the meantime, on March 31, 2011, the Seatons signed a lease on another residence but were unable to move in immediately. *Id*. at 13, 14.

It is at the Continued Hearing where the divergence of testimony as to what occurred begins. Mr. Seaton testified the State Court judge stated that he believed he had no jurisdiction because of the Petition and informed George Eberwine he could take no action against the Seatons. *Id*. at 15. Mr. Seaton further testified he advised the State Court judge he was trying to move out of the Apartment. *Id*. at 16. Mr. Seaton additionally testified the State Court judge continued the Unlawful Detainer to April 11, 2011, and advised that if the keys to the Apartment had been turned over to Collinswood, nether Mr. Seaton nor George Eberwine needed to appear on April 11, 2011. *Id*. Based upon this, Mr. Seaton believed he could remain in the Apartment until April 11 or when he returned the keys to Collinswood. *Id*. at 17.

George Eberwine's recollection of the Continued Hearing is dissimilar to that of Mr. Seaton. George Eberwine testified that at the Continued Hearing, Mr. Seaton immediately advised the State Court judge that "There's nothing to do, I've already moved out," *id*. at 89; *see also id.* at 99, 100, 107, prompting the State Court judge to advise, "That takes care of that," and "There's nothing to do." *Id*. at 89; *see also id.* at 90, 99-100. George Eberwine recalled no other discourse with the State Court judge nor any recognition that the Unlawful Detainer was continued to April 11, 2011. *Id*. at 99-100, 102. A review of the Unlawful Detainer as annotated by the State Court judge reveals

5

nothing to confirm either version of what occurred at the Continued Hearing, except that the

Unlawful Detainer apparently was continued to April 11, 2011. *See* Seaton Exh. D. Neither George

Eberwine nor Mr. Seaton returned to State Court on April 11, 2011, Tr. at 17, and a review of the

annotated Unlawful Detainer indicates it was dismissed on April 11, 2011.[2] *See* Seaton Exh. D.

It is this Court's view that, where two witnesses have disparate recollections, such as those

of Mr. Seaton and George Eberwine regarding the Continued Hearing, often the circumstance of

what was said is a combination of the testimony. It is very likely that once Mr. Seaton shared his

intent to quit the Apartment, neither the State Court judge nor George Eberwine focused on whether

the statement sounded in the past or present tense. It is also most likely the State Court judge would

have immediately recognized that Mr. Seaton's statement about his voluntary exodus from the

Apartment mooted the Unlawful Detainer and relieved the State Court from further pondering the

implications of the pendency of the Petition on the Unlawful Detainer. Continuing the Unlawful

Detainer for one week, then, would logically follow to provide the State Court with a certain

mechanism to ensure the Seatons followed through with Mr. Seaton's stated intention to quit the

Apartment and to determine if the Unlawful Detainer had indeed been mooted. This Court believes

it is highly unlikely the State Court judge imposed any other restrictions on the parties in the interim,

and it seems far more probable that the source of Mr. Seaton's conclusion he could remain in the

Apartment until April 11, 2011, or until the surrender of the keys was not statements by the State

---

[2] The General District Courts of the Commonwealth of Virginia do not routinely record or transcribe their proceedings, and neither Mr. Seaton nor George Eberwine caused a recording or transcription of the Continued Hearing to be made. Accordingly, except for the State Court judge who was neither identified nor called as a witness at the instant hearing, there is no source other than the parties as to what was said at the Continued Hearing. *See* Va. Code Ann. § 16.1-69.5 (2011) (defining "Courts not of record" to include General District Courts).

Court judge but, rather, was an assumption Mr. Seaton made when the Unlawful Detainer was continued to April 11.

Meanwhile, the Seatons moved property from the Apartment on April 4, 2011. Tr. at 19-20. On the morning of April 5, 2011, George Eberwine advised his son, Kittrell Eberwine, the manager of Collinswood, what had occurred at the Continued Hearing and that the Seatons had "moved out." *Id*. at 91, 105, 127.  On the afternoon of April 5, Kittrell Eberwine entered the Apartment and inspected it, upon which he saw what he described as "general debris." *Id*. at 112-13.  Kittrell Eberwine inspected the refrigerator and found only "a bowl of . . . baked beans that was kind of dried up, two Red Bull energy drinks and . . . a carton of milk that had maybe a quarter inch left in it." *Id*.  His inspection of the pantry and all of the kitchen cabinets revealed only a few cans or items. *Id*. at 113, 117.  Kittrell Eberwine's inspection of the Apartment beyond the kitchen revealed beer cans, cigarette butts, "one pair of work boots that were pretty worn" (which pair was separated with one boot in the hallway and one in the den), and piles of clothes in one or two rooms, all of which were loose and unboxed.  *Id*. at 113-14.  Kittrell Eberwine found no furniture in the Apartment during the inspection, which, to him, confirmed his father's statement that the Seatons had moved out, and "[h]e was gone." *Id*. at 114.  Kittrell Eberwine described what remained in the Apartment succinctly:  "There wasn't anything in there.  It was what I consider junk.  It was nothing substantial." *Id*. at 114-15.  He then instructed an employee of Collinswood to clean out the Apartment, which the employee proceeded to accomplish that day, discarding the items remaining in the Apartment in a nearby dumpster. *Id*. at 115.  Another employee of Collinswood changed the locks on the Apartment the same afternoon (April 5, 2011). *Id*.

Both the Seatons testified as to the great anguish and distress they felt when discovering their

property in the dumpster on April 6, 2011.  Mr. Seaton recalled his wife's immediate and distressed

crying upon seeing their belongings in the dumpster.  *Id*. at 23-24, 56-58.  He went on to describe

the length of time these emotions persisted: "Every time that she talked to somebody for the first

couple of days it was like that. . . .  She's still emotional, even before this date.  Even before we

came in here she was crying about it."  *Id*. at 37.  Mr. Seaton also testified as to the effect the events

have had on himself and on the Seatons' relationship:

> [A] lot of it causes a lot of arguments between me and my wife because she gets so
> bent out of shape behind all of her things because like, for instance, going through
> it taking the pictures, remembering everything, it just puts her into a crying spell and
> then I get frustrated because I get upset, because it was done to her that I get angry,
> and it causes arguments between me and my wife.  My baby's pictures and stuff like
> that really tore me apart because my baby is a diabetic.  He is 20 months old and he's
> got to be insulin dependent for the rest of his life, and those pictures meant more to
> me than anything else in this world.  To see them lying in that dumpster tore me
> apart.

*Id*. at 56.  Mrs. Seaton read into evidence a letter she wrote to her counsel (which was admitted

without objection), in which she describes her and her husband's "hurt and humiliation" in addition

to the embarrassment resulting from her husband entering the dumpster to retrieve their belongings,

her feeling of "violat[ion] as though no one had [the] heart to see that these things meant something

to" them.  She went on to state that she does not "think we could ever get past that feeling."  *Id*. at

57-58; Seaton Exhibit F, Letter from Mrs. Seaton to her counsel.  Mrs. Seaton became very

emotional at one point during her testimony when she recalled two sentimental, antique prints that

the Seatons allege were not found among the items in the dumpster.  *Id*. at 70.

It is the extent of what was allegedly disposed of from the Apartment where the overall

testimony of the Seatons and the Eberwines is perhaps at greatest variance.  Mr. Seaton testified he

recovered a number of items of personal property from the dumpster adjacent to the Apartment.

These items consisted of 13 or14 pairs of women's shoes, a shoe rack, a ceramic Santa Claus cookie jar, blankets, a decorative glass globe, sheets, Mrs. Seaton's baby clothes, pictures of the Seatons' son, and baby cowboy boots that once belonged to Mrs. Seaton's father. Tr. at 25, 27, 33-35. Mrs. Seaton identified an extensive list of grocery items (hereinafter, "Grocery Items") she compiled, based on what she normally maintains in her pantry, that she contends were in the Apartment at the time of the property removal by Collinswood. *See id.* at 63, 81; Seaton Exh. I, List of Grocery Items. The list also contains Mrs. Seaton's estimate of the replacement value for the Grocery Items, which she retrieved from the Internet. Tr. at 63. Mrs. Seaton further testified as to the items she believes were remaining at the Apartment, discarded by Collinswood, and not recovered from the dumpster. These items were identified in Seaton Exhibit J and consisted of two antique framed prints where the subject was a baby, a hard hat, two pairs of men's work boots, a quilt, and a plastic box of items described by Mr. Seaton as "pleasure items" that Mrs. Seaton had purchased as part of a kit for resale of the items. The latter items were allegedly contained in a pink box or case. *See* Tr. at 42, 68-76. On cross-examination, Kittrell Eberwine specifically denied seeing the pink box, the antique prints, the hard hat, the shoe rack, baby photographs, baby cowboy boots, and the ceramic Santa Claus cookie jar. *Id.* at 116-18, 126. He did not recall seeing bedding items or women's shoes, unless they were piled on the floor or under the piles of clothing. *Id.* at 116-17, 126.

### III. Conclusions of Law

#### A. Was There a Violation of the Automatic Stay?

At the outset, it is important to note what events the Seatons do *not* assert as violations of the automatic stay. The Seatons do not contend that any of the events specifically relating to the institution or continuation of the Unlawful Detainer constitute a stay violation. Rather, it is only the

removal and disposal of certain items of their personal property from the Apartment at Collinswood

that they believe are sanctionable by this Court.  Accordingly, the Court's attention will be directed

solely upon that aspect of the Seatons' exodus from the Apartment.

Section 362 of the Bankruptcy Code provides, in relevant part:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—

>> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

>> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

>> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

>> (4) any act to create, perfect, or enforce any lien against property of the estate;

>> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1)-(5) (2011).

Judge Carruthers has well-described the import and purpose of the automatic stay pursuant

to 11 U.S.C. § 362:

> Upon a debtor's filing of a bankruptcy petition, the automatic stay provided by 11 U.S.C. § 362(a) operates to stay, among other things, all actions "to collect, assess,

10

or recover a claim against the debtor that arose before the commencement of the case under the title." 11 U.S.C. § 362(a)(6). The automatic stay also prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay is a bedrock principle upon which the Code is built; the importance of § 362 cannot be over-emphasized. *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200 (4th Cir. 1988). "The purpose of the automatic stay, in addition to protecting the relative position of creditors, is to shield the debtor from financial pressure during the pendency of the bankruptcy proceeding." *Winters By and Through McMahon v. George Mason Bank*, 94 F.3d 130, 133 (4th Cir. 1996) (citation omitted). The automatic stay provides the debtor a breathing spell from creditors, affording the debtor time to reorganize. *Grady v. A.H. Robins Co.*, 839 F.2d at 200 (quoting House Report No. 95-595, 95th Cong. 1st Sess. 340-1 (1977)). Thus, the purpose of the automatic stay is two-fold: to preserve the relative positions and rights of creditors as established by the Bankruptcy Code and to protect the debtor, individually, from collection activities.

*In re Garner*, Case No. 09-81998, 2010 WL 890406, at *2 (Bankr. M.D.N.C. Mar. 9, 2010)

(unreported decision). Violations of the automatic stay are subject to an award of sanctions pursuant

to § 362(k):

Section 362(k)(1) provides, with one exception, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." In order to recover under this section, a debtor must prove five elements: "'(1) that a bankruptcy petition was filed, (2) that the debtors are 'individuals' under the automatic stay provisions, (3) that creditors received notice of the petition, (4) that the creditors' actions were in willful violation of the stay, and (5) that the debtor suffered damages.'" *Lomax v. Bank of Am., N.A.*, 435 B.R. 362, 376 (N.D. W. Va. 2010) (quoting *Grisard-Van Roey v. Auto Credit Ctr., Inc.* (*In re Grisard-Van Roey*), 373 B.R. 441, 444 (Bankr. D.S.C. 2007)).

*Burch v. Bank of Am., N.A.* (*In re Burch*), Adv. No. 11-80030-DD, 2011 WL 3207083, at *2 (Bankr.

D.S.C. July 26, 2011) (slip opinion).

This Court has previously opined upon the issue of willfulness in the context of an automatic

stay violation within this circuit:

The Fourth Circuit Court of Appeals has considered the necessary evidentiary showing to establish a willful violation of the automatic stay, holding that "to

11

constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay." *Citizens Bank v. Strumpf* (*In re Strumpf*), 37 F.3d 155, 159 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (citing *Budget Service Co. v. Better Homes*, 804 F.2d 289, 292-93 (4th Cir. 1986)); *Cuffee v. Atl. Bus. & Community Dev. Corp.* (*In re Atl. Bus. & Community Dev. Corp.*), 901 F.2d 325, 329 (3rd Cir. 1990). In *Better Homes*, the court stated that the conduct of a creditor in violating the stay is willful when "[t]here is ample evidence in the record to support the conclusion that [the creditor] knew of the pending petition and intentionally attempted to [continue collection procedures] in spite of it." *Better Homes*, 804 F.2d at 292-93. Accordingly, in order for conduct to be willful, it must be intentional or deliberate. *See Hamrick v. United States* (*In re Hamrick*), 175 B.R. 890, 892 (W.D.N.C. 1994) (citing *In re Shealy*, 90 B.R. 176, 179 (Bankr. W.D.N.C. 1988)). Courts, accordingly, have contrasted "willful" conduct by creditors with violations which were "inadvertent" and where no injury occurs. *See id.* at 893.

*Cherry v. Arendall* (*In re Cherry*), 247 B.R. 176, 187-88 (Bankr. E.D. Va. 2000); *see also Nunnery v. Rountree* (*In re Rountree*), 448 B.R. 389, 418 (Bankr. E.D. Va. 2011).

Here, the Respondents defend principally on the notion that they did not intend to violate the automatic stay by taking control and disposing of any of the Seatons' personal property remaining at the Apartment. Rather, the removal and disposal of any remaining personalty was provoked by their belief that the Seatons had moved, and the remaining items of personal property had been abandoned. This lack of specific intent, they argue, negates any willfulness in any automatic stay violation that occurred here.

The absence of specific intent to violate the automatic stay as to the Seatons' personalty, while relevant to some considerations here, nonetheless under the case law fails to negate the willfulness of the actions of removal and disposal of the remaining personalty. Here it is undisputed that George Eberwine became aware of the Petition at the time of the Original Return Date of the Unlawful Detainer. Thus, under the prevailing precedent, he is deemed to have knowledge of the automatic stay. *Scott v. Wells Fargo Home Mortg., Inc.*, 326 F. Supp. 2d 709, 718 (E.D. Va. 2003)

("Willful conduct refers to deliberateness of conduct and knowledge of bankruptcy filing, not to specific intent to violate court order.") (citing *Aponte v. Aungst* (*In re Aponte*), 82 B.R. 738, 742 (Bankr. E.D. Pa. 1988)); *see also W. Va. State Tax Dep't v. Mullins* (*In re Mullins*), Civil Action No. 2:00-0571, 2009 WL 3160361, at *2 (S.D. W. Va. Sept. 30, 2009) (unreported decision) ("'[A] deliberate or intentional act done with knowledge of the bankruptcy, which violates the automatic stay, constituted a willful violation.'") (quoting *In re Mullins*, No. 98-20033, slip op. at 15-16 (Bankr. S.D. W. Va. May 9, 2000)); *KCH Servs. v. The Nordham Grp.*, 345 B.R. 542, 548 n.5 (W.D.N.C. 2006) (finding that a party who has knowledge of a pending bankruptcy proceeding is charged with knowledge of the automatic stay) (citing *Zilog, Inc. v. Corning* (*In re Zilog, Inc.*), 450 F.3d 996, 1008 (9th Cir. 2006)); *McLaughlin v. Fireman's Trust Mortg. Corp.* (*In re McLaughlin*), 96 B.R. 554, 559-60, 562-63 (Bankr. E.D. Pa. 1989) (collecting cases holding that knowledge of the bankruptcy filing is the legal equivalent of knowledge of the automatic stay). The acts of removal and disposal of the Seatons' personalty at the Apartment were intentional "act[s] to obtain possession of property of the estate . . . or to exercise control over property of the estate" in contravention of 11 U.S.C. § 362(a)(3), done with knowledge of the pending Petition. That the Respondents undertook such acts without any intent to violate the automatic stay does not negate a violation in light of the clear admonition by the Fourth Circuit Court of Appeals that "to constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay." *Citizens Bank v. Strumpf* (*In re Strumpf*), 37 F.3d 155, 159 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 16 (1995) (citing *Budget Serv. Co. v. Better*

*Homes*, 804 F.2d 289, 292-93 (4th Cir. 1986)).[3]

The strict standard applied in the determination of willfulness in the context of an automatic

stay violation involving disposal of a tenant's property is well illustrated in *B. Cohen & Sons*

*Caterers, Inc. v. New Plan Realty Trust* (*In re B. Cohen & Sons Caterers, Inc.*), 97 B.R. 808 (Bankr.

---

[3] While not directly germane to the Court's consideration of whether a violation of the automatic stay occurred here, it appears that Collinswood did not comply with Virginia's statutory provisions governing removal and disposal of a residential tenant's personal property following the termination of a lease. Section 55-248.38:1 of the Code of Virginia provides:

> If any items of personal property are left in the premises, or in any storage area provided by the landlord, after the rental agreement has terminated and delivery of possession has occurred, the landlord may consider such property to be abandoned. The landlord may dispose of the property so abandoned as the landlord sees fit or appropriate, provided he has: (i) given a termination notice to the tenant in accordance with this chapter, which includes a statement that any items of personal property left in the premises would be disposed of within the twenty-four hour period after termination, (ii) given written notice to the tenant in accordance with § 55-248.33, which includes a statement that any items of personal property left in the premises would be disposed of within the twenty-four hour period after expiration of the seven-day notice period, or (iii) given a separate written notice to the tenant, which includes a statement that any items of personal property left in the premises would be disposed of within twenty-four hours after expiration of a ten-day period from the date such notice was given to the tenant. Any written notice to the tenant shall be given in accordance with § 55-248.6. The tenant shall have the right to remove his personal property from the premises at reasonable times during the twenty-four hour period after termination or at such other reasonable times until the landlord has disposed of the remaining personal property of the tenant.
>
> During the twenty-four hour period and until the landlord disposes of the remaining personal property of the tenant, the landlord shall not have any liability for the risk of loss for such personal property. If the landlord fails to allow reasonable access to the tenant to remove his personal property as provided in this section, the tenant shall have a right to injunctive or other relief as provided by law. If the landlord received any funds from any sale of abandoned property as provided in this section, the landlord shall pay such funds to the account of the tenant and execution of such writ has been completed pursuant to § 8.01-470.

Va. Code Ann. § 55-248.38:1 (2011).

14

E.D. Pa. 1989).  In that case, the removal and disposal of a tenant's personal property at the leased premise was found to constitute a stay violation notwithstanding the fact the landlord had earlier obtained relief from the automatic stay to take possession of the premises:

> The Landlord's only real legal defenses appears to be contentions that, because (1) it obtained relief from the automatic stay in both the Debtor's bankruptcy case and the bankruptcy case of [the Debtor's principal] individually; and (2) it [had] obtained a pre-petition court judgment and levy in the state-court landlord-tenant action brought against [the Debtor's principal], it cannot be found to have violated the automatic stay.  However, in both of the bankruptcy cases in which relief from the stay was obtained by it, the Landlord was granted relief from the stay merely "to regain possession of the premises."  Relief from the stay, for this limited purpose only, clearly did not give the Landlord relief from the stay or authority to detain or take any other action in reference to the personal property of the Debtor's estate on its Premises, even pursuant to lawful state-court processes.  Therefore, although it had obtained some limited relief from the automatic stay, any actions by the Landlord which adversely affected the Debtor's right to retain possession of its personalty on the Premises was violative of the residuum of the automatic stay.  This being so, the exercise of full dominion over this property by detaining it, destroying it, and liquidating it, constituted a gross violation of the automatic stay by the Landlord.

*Id*. at 813-14.  The fact the Seatons' personal property was abandoned by the Chapter 7 Trustee in the course of their bankruptcy case (specifically, on April 21, 2011, upon the filing of his Report of No Distribution) subsequent to its removal from the Apartment on April 5, 2011, also fails to negate a stay violation.  *Kaiser v. Leader Fed. Bank for Sav.* (*In re Kaiser*), 158 B.R. 808, 812 (Bankr. D. Neb. 1993) ("[The creditor] violated § 362(a)(3) by taking possession of property of the estate.  In connection with my conclusions that § 362(a)(3) was violated, I conclude that debtor's personal property and real property were property of the bankruptcy estate under § 541 on November 10, 1990, which was the date the property was removed from debtor's home.  The trustee did not file a Notice of Intent to Abandon Property (Fil. # 9) until December 5, 1990.  The property of the estate was not abandoned until after [the creditor] had violated the stay."); *see also Little Pat, Inc. v.*

15

*Conter* (*In re Soll*),181 B.R. 433, 444 (Bankr. D. Ariz. 1995) ("A debtor's vacating the premises is

not an abandonment so as to remove the property from the bankruptcy estate."). Accordingly,

having concluded that the Respondents, jointly and severally, committed a willful violation of the

automatic stay by removing and disposing of certain personal property of the Seatons, it remains to

consider the damages claimed by the Seatons.

## B.  Damages

Subject to one exception (which is inapplicable here), § 362(k)(1) provides that "an

individual injured by any willful violation of a stay provided by this section shall recover actual

damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover

punitive damages." 11 U.S.C. § 362(k)(1) (2011). The Bankruptcy Code supplies no definition of

"actual" damages nor does the legislative history of this section enlighten as to Congressional intent

beyond the specific statutory language. The Seatons seek an array of damages here, including at

least $1,732.52 for the personal items removed from the Apartment, $20,000.00 in pain and

suffering, $30,000.00 in punitive damages, and $10,378.04 in attorney's fees and costs. Despite the

lack of further statutory definition of the measure of damages to be applied, courts have found a

number of precepts to be appropriate in considering an award of damages for an automatic stay

violation.

### 1.  The Measure of Damages

An award of damages for a willful violation of the automatic stay must be founded on

concrete, non-speculative evidence:

> For purposes of Section 362(k), actual damages should be awarded only if there is
> concrete evidence supporting the award of a definite amount. *Heghmann v. Indorf*
> (*In re Heghmann*), 316 B.R. 395, 405 (B.A.P. 1st Cir. 2004). "A damages award
> cannot be based on mere speculation, guess or conjecture." *Id.* An award of punitive

16

damages, on the other hand, usually requires more than a mere willful violation of the automatic stay.  *Id.*  Relevant factors courts consider when determining whether punitive damages should be awarded include:  (1) the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the motive of the creditor; and (4) any provocation by the debtor.  *Id.*  An award of punitive damages is often limited to those cases where there is egregious, intentional misconduct.  *Id.*

*Rawles v. Wych* (*In re Rawles*), Adv. No. 08-00555, 2009 WL 2924005, at *2 (Bankr. D. Md. June 18, 2009) (unreported decision).  *Accord Hanna Coal Co. v. I.R.S.*, 218 B.R. 825, 832 (W.D. Va. 1997) ("'A damage award (under § 362(h) [the predecessor to § 362(k)]) must not be based on 'mere speculation, guess, or conjecture.'") (citing *In re Gault*, 136 B.R. 736, 739 (Bankr. E.D. Tenn. 1991) (quoting *John E. Green Plumbing & Heating Co. v. Turner Constr. Co.*, 742 F.2d 965, 968 (6th Cir. 1984))); *Fed. Home Loan Mortg. Corp. v. McCormack*, Civil No. 96-81-SD, 1996 WL 753938, at *5 (D.N.H. Sept. 3, 1996) (unreported decision) ("Although '[a] party seeking damages must prove them using methodologies that need not be intellectually sophisticated . . . a damage award cannot be based on mere speculation, guess or conjecture.'").  The debtor has the burden to establish by a preponderance of the evidence that he suffered actual damages as a result of the stay violation. *Duby v. U.S.* (*In re Duby*), 451 B.R. 664, 670 (B.A.P. 1st Cir. 2011) (citing *Vázquez Laboy v. Doral Mortg. Corp.* (*In re Vázquez Laboy*), 416 B.R. 325, 332 (B.A.P. 1st Cir. 2009); *Heghmann v. Indorf* (*In re Heghmann*), 316 B.R. 395, 403-04 (B.A.P. 1st Cir. 2004)).

A special dilemma exists when the damage claimed by reason of a stay violation is the loss of used household goods.  The dilemma of valuing personal property in the context of an automatic stay violation has been well-explained by Judge Scholl:

[A] difficult issue is presented in determining the value of the Debtor's property destroyed by the Landlord and hence constituting the appropriate measure of compensatory damages to the Debtor here.  We have three points of reference: (1) [t]he Debtor's own Schedules, which would limit its recovery to $16,500; (2) [one of the principals of the Debtor]'s testimony, which would support a recovery of

$400,000; and (3) [the Landlord's] testimony in which he stated that he would have expected to have realized a recovery of between $50,000 and $100,000 for the property in issue "as is," and that its replacement cost ranged from between $500,000 and $700,000.

Acceptance of [the Debtor's principal]'s testimony is problematical for several reasons.  Although she is clearly competent to testify as to the value of her own corporation's property, her proof of the value consists of lists, itemized by entry but not by the value of each entry, which are based on her memory of *acquisition* costs of that property over the past 30 years.  Moreover, she is obviously a biased witness.  In our view, it is the market value of the goods as of July, 1988, which must control the evaluative process.  This is the measure of damages for property converted.  Replacement or acquisition costs are relevant, but they are certainly not the ultimate barometer of the actual damages suffered by the Debtor from the loss of its property.  The difficulty of effecting a replacement is merely a factor in ascertaining consequential damages and in measuring the appropriate punitive damages.  However, no evidence of any consequential damages was proven. Therefore, we believe that the sole measure of the Debtor's actual damages must be the market value of the Debtor's goods at the time of their conversion by the Landlord.

*In re B. Cohen & Sons Caterers, Inc.*, 97 B.R. at 816-17 (internal citations omitted).  Judge Scholl also recognized the additional burden where the value of the personalty claimed at the time of the automatic stay violation is at variance with the value claimed in a debtor's schedules:

The weight of [the Debtor's principal]'s apparently accurate testimony regarding acquisition costs is lessened by their comparison to the figures on the Schedules.  We cannot emphasize strongly enough that it is important that debtors complete their Schedules accurately.  They are, of course, prepared on a self-declaratory "honor system."  They must therefore be considered highly significant, at least when invoked against a debtor to attempt to hold it to its own "honor-system" declarations. The weakest part of [the Debtor's principal]'s  testimony was her futile efforts to explain why the Schedules were filled out incorrectly.  We see no reason why [the other principal of the Debtor] would be totally ignorant about the value of the Debtor's property nor why, if he were uncertain, he would not have consulted with [the other principal] about the figures.  It is, moreover, inexcusable that no amendment has been made, even to date, and we are therefore including, in our Order, a directive that this be done.  It ill befits a debtor to admit that its own Schedules are not only inaccurate, but remain unamended to correct the inaccuracies after they are pointed out to it.

*Id.* at 817 (internal citations omitted).  In the instant matter, the Seatons did not specifically list in

their bankruptcy schedules any of the property they claim was removed from the Apartment.

Indeed, in their bankruptcy schedules, the Seatons list no clothing, even as an aggregate, and no

household items except for a television, a sofa, a loveseat, a kitchen table, a bed, a dresser, a crib,

and a computer.

The difficulty of valuing personal property lost as the result of a stay violation has been

reflected in the variety of approaches employed by the courts.  A number of courts have found the

appropriate measure of damages for the loss of goods due to an automatic stay violation is the fair

market value.  *Robinson v. Ford Motor Credit Co.*, No. 1:08cv1081, 2009 WL 455270, at *4 (E.D.

Va. Feb. 20, 2009) (unreported decision) ("The court also did not err when it used the auction price

at which [the debtor]'s car was sold to approximate its fair market value, as that was the only clear

evidence of its value in the record."); *In re Jester*, 344 B.R. 331, 339 (Bankr. E.D. Pa. 2006) ("The

damage claimed by Debtor is loss of her Vehicle measured by its fair market value."); *Kaufman v.

Monte* (*In re Kaufman*), 315 B.R. 858, 866 (Bankr. N.D. Cal. 2004) ("The basic measure of damages

is the amount of the economic loss [the debtor] suffered as the proximate result of Defendants'

violation, taking into account the fair market value of the property that they disposed of in violation

of the stay, and any other factors relevant to making [the debtor] economically whole.") (internal

citations omitted); *Lankford v. Advanced Equities, Inc.* (*In re Lankford*), 305 B.R. 297, 302 (Bankr.

N.D. Iowa 2004) ("Debtors' valuation of their missing and/or damaged property at close to $4,000

is based on retail prices for the various items. . . .  Market value is a more appropriate measure of

actual damages in this matter, rather than retail value."); *McCarthy v. Imported Cars of Md., Inc.*

(*In re Johnson*), 230 B.R. 466, 471 (Bankr. D.D.C. 1999) (finding that the appropriate measure of

damages was the amount the trustee could have secured for sale of vehicle had it not been seized in

violation of the stay); *In re Rivers*, 160 B.R. 391, 393 (Bankr. M.D. Fla. 1993) ("The correct

measure of damages for loss of household goods is fair market value."); *In re B. Cohen & Sons

Caterers*, 97 B.R. at 817 ("[I]t is the market value of the goods as of July, 1988 [the month and year

in which the property was disposed of by the offending creditor], which must control the evaluative

process."); *see also Davis v. Washington* (*In re Davis*), 62 B.R. 345, 347 (Bankr. S.D. Ohio 1986)

("[The debtor] admitted that the same property she has valued at $5,000 at the hearing, she had

valued at $650 at the time of her signing her bankruptcy schedules on July 12, 1985 declaring that

the schedules were 'true and correct to the best of her knowledge, information and belief.'").

At least one court has found a special rule for measuring damages for a loss of goods due to

a stay violation, concluding the measure is not fair market value but, instead, the value of the goods

to the debtor:

> In restoring the value of the property taken by the violation of the automatic stay, the
> court must employ the standard rule that the value to be restored is the value of the
> property to the debtor.  "According to the great weight of authority, the measure of
> damages for the conversion of household goods, furniture, books, manuscripts, or
> wearing apparel, kept and adapted for personal use, is not the second hand market
> value of property, but the actual and fair value *to the owner*, excluding any fanciful
> or sentimental value to the owner, excluding." 89 C.J.S. Trover and Conversion sec.
> 196, p. 658. (Emphasis added.)  Thus, while the fair market value is the usual and
> ordinary measure of damages, the law of damages recognizes that the court may
> consider any special or heirloom value which the property may have; that the injured
> party should be made whole, not only by recovery of "the intrinsic or market value"
> of the personal property, but also its "special and extrinsic value."  *Kalinowski v.
> M.A. Newhouse & Son*, 53 S.W.2d 1094, 1096 (Mo. App. 1932).  In assessing this
> special value, the trier of fact is granted particular latitude to assay all the facts and
> circumstances of the case.  As noted above, in making the determination of special
> value, the trier of fact is not bound by opinion evidence, "but rather [is] obliged to
> ascertain the amount of the damages in the light of all the facts and circumstances of
> the case."  *Id.* at 1097.  "The question of such valuation [is] peculiarly one for the
> jury [or other trier of fact] in the light of all the facts and circumstances of the case."
> *State ex rel. Terry v. Ace Storage and Moving Co.*, 135 S.W.2d 363, 368 (Mo. App.
> 1940).

*Walters v. Hatcher* (*In re Walters*), 41 B.R. 511, 516-17 (Bankr. W.D. Mo. 1984); *see also Kaiser v. Leader Fed. Bank for Savs.* (*In re Kaiser*), 158 B.R. 808, 812-13 (Bankr. D. Neb. 1993) ("I conclude that the debtor should be compensated for those items which are of sentimental value to her, even though they have only nominal cash value."). The *Walters* court relied upon Missouri state law in concluding "special" or "extrinsic" value was an appropriate measure for assessing damages in the context of a stay violation. This Court is skeptical that state law is instructive in interpreting the correct measure of "actual" damages for a loss of goods occasioned by a stay violation. However, to the extent state law is relevant, it appears Virginia would look to the market value as the measure of damages for goods converted. *E. Coal & Exp. Corp. v. Norfolk & W. Ry. Co.*, 113 S.E. 857, 859 (Va. 1922) ("'Ordinarily the market value at the time and place of conversion is the rule.'") (quoting *Roth Coal Co. v. Louisville & Nashville R. Co.*, 215 S.W. 404 (Tenn. 1919)); *see also Kondaurov v. Kerdasha*, 629 S.E.2d 181, 187 n.5 (Va. 2006) ("In *C & O Ry. Co. v. May*, 120 Va. 790, 797, 92 S.E. 801, 803 (1917), we approved an instruction telling the jury that the owners of personal property destroyed by a defendant's negligence (family portraits, in that case) were not entitled to recover 'any sentimental value attached to it by the owners or any peculiar value which they may have attached to the property by reason of association or the like.'"). Accordingly, it appears the proper measure for assessment of damages for the loss of goods due to a violation of the automatic stay is their fair market value at the time of the loss.

Given the unusual amalgam of personalty claimed to have been removed from the Apartment, some of which Mr. Seaton retrieved from the dumpster and some alleged to be missing, and the differing evidence submitted as to the value of each item, it regrettably appears that only an item by item analysis will suffice here. Attached to this opinion as Appendix A is a compilation of

the items claimed in damages by the Seatons that lists the claimed value of each item as set forth in two separate exhibits proffered by the Seatons.  In this text, the Court will address these items in two groups, the first being the items claimed to have been at the Apartment and that remain missing or could not be salvaged, and the second being the items that were retrieved and removed from the dumpster by Mr. Seaton.

### 2.  Items Claimed to be Missing

#### a.  The Groceries

With respect to the Grocery Items, the Seatons contend $341.83 in groceries were removed from the Apartment and disposed.  The Court believes that the testimony of Kittrell Eberwine as to the extent of the Grocery Items present in the Apartment is more credible than the evidence adduced by the Seatons.  Mrs. Seaton admitted her compilation of the Grocery Items was based upon her memory of what she normally would have on hand in her pantry.  Tr. at 81.  Kittrell Eberwine's testimony as to the meager amount of items he observed in the refrigerator, pantry, and kitchen cabinets is based on his direct observations during his inspection of the Apartment on April 5, 2011.  Further, given that the Seatons were well into the process of moving their personal property from the Apartment at the time of disposal, it seems unlikely the lengthy list of Grocery Items claimed by Mrs. Seaton would have still remained in the Apartment.  More credible is Kittrell Eberwine's observation of a few, seemingly abandoned items of food in the refrigerator, pantry, and cabinets. The Seatons' evidence as to the allegedly discarded Grocery Items is not credible in light of Kittrell Eberwine's testimony and is excessively speculative to form the basis of a damage award. Accordingly, the Court awards no damages for the alleged loss of the Grocery Items.

b.  The Other Items of Personalty

With respect to certain of the other items of personalty that allegedly remained at the Apartment at the time of disposal by Collinswood, the evidence as to the presence of certain of these items at the Apartment at such time is speculative.  Mrs. Seaton testified that a pink box or case containing items for resale was at the Apartment and discarded by Collinswood.  Kittrell Eberwine was asked specifically if he saw such a box or case of items and unequivocally stated he had not seen such an item at the Apartment at the time of his inspection on April 5, 2011.  Given Mrs. Seaton's description of the size of the box, its striking pink color, and the nature of its contents, it appears highly unlikely this box would have been unnoticed by Kittrell Eberwine when inspecting the Apartment.  Also problematic is the fact the Seatons did not schedule this box of items in their Schedule B of personal property despite its claimed replacement cost of $250.00 and the fact it had been purchased by Mrs. Seaton for resale.  Based upon Kittrell Eberwine's testimony, which the Court finds to be more credible, the Court determines the box of items should not constitute a basis for an award of damages.

The other items claimed to be missing consist of two antique prints, a hard hat, two pairs of men's work boots, and a quilt.  Of these items, Kittrell Eberwine only identified a worn pair of work boots as present at the Apartment at the time of his inspection.  The evidence adduced by the Seatons as to the value of the remaining items (hereinafter, the "Missing Items") in each instance is founded upon the Seatons' research as to the replacement cost for this property, with the exception of the two antique prints, which Mrs. Seaton testified she found similar, used items on eBay that had a "Buy It Now" price of  $84.99 each.  Seaton Exhibit J, Estimates of Repair/Replacement for Missing Items.  None of the Missing Items were listed in the Seatons' personal property bankruptcy

23

schedules.  Accordingly, because of the speculative nature of even the presence of the Missing Items

at the Apartment at the time of the property removal by Collinswood (with the exception of the worn

pair of boots acknowledged by Kittrell Eberwine), the failure of the Seatons to adduce any evidence

of the fair market value of the Missing Items (except for the antique prints),[4] and the failure of the

Seatons to list any of the Missing Items in their bankruptcy schedules, the Court is unable to award

any damages regarding the Missing Items.

### 3.  Items Retrieved from the Dumpster

The Seatons also claim Mr. Seaton retrieved a number of items of their personal property

from the dumpster (hereinafter, "Retrieved Items").[5]  The Seatons' valuations of these items consist

of largely Internet-based research of the price of similar, but new, goods.  Seaton Exhibit I,

Estimates of Repair/Replacement for Retrieved Items.  These items, while perhaps sustaining some

damage from their disposition into the dumpster, nonetheless were retrieved due to Mr. Seaton's

---

[4] The Court is neither unmindful of nor unsympathetic to the dilemma of a debtor attempting to prove the fair market value of used household items where no recognized system of valuation exists such as the existing guides to value motor vehicles, the NADA Used Car Guide and Kelley Blue Book.  Despite this difficulty, in the instant matter the Seatons failed to adduce sufficient evidence that may have assisted the Court in determining the fair market value of these items of personal property, such as the date of acquisition, the condition, or the original cost of the items.  Particularly absent from the record here is the methodology the Seatons would have utilized to value the items on their bankruptcy schedules, which was unavailable because the Seatons failed to schedule any of the items, as an aggregate or otherwise.  Since the scheduling of assets requires a determination of fair market value by the debtors at the time of the filing of a bankruptcy petition, often the scheduled value of assets is an important starting point in determining fair market value.  However, the Seatons' failure to schedule any personal property except for furniture and a computer deprives the Court of this reference point.

[5] Mr. Seaton testified he retrieved from the dumpster at the Apartment 13 or 14 pairs of women's shoes, a shoe rack, a ceramic Santa Claus cookie jar, blankets, a decorative glass globe, sheets, Mrs. Seaton's baby clothes, pictures of the Seatons' son, and baby cowboy boots that once belonged to Mrs. Seaton's father.  *Id*. at 25, 27, 33-35.

efforts.  The prices introduced into evidence reflect the replacement cost for these items, not their

fair market value.  As a result, the Court finds that the Seatons have failed to adduce sufficient

evidence to quantify the damage, if any, sustained to these items as a result of their placement into

the dumpster. Accordingly, the Court is unable to award any damages for the Retrieved Items.

### 4. Emotional Distress Damages

The Seatons also seek an award of damages for what they characterize as "pain and

suffering," which seem to approximate what many courts characterize as emotional distress damages

in the context of an automatic stay violation.  Judge Mitchell of this Court has explained the division

of authority among courts in awarding damages for emotional distress:

> If the present proceeding is viewed purely as a civil contempt proceeding, it seems
> clear that there is no authority to award damages for emotional distress.  *Burd v.
> Walters*, 868 F.2d 665, 670 (4th Cir. 1989) (vacating award of $1,000 in damages to
> a debtor for emotional distress and stating "no authority is offered to support the
> proposition that emotional distress is an appropriate item of damages for civil
> contempt, and we know of none").  If viewed instead as an action for damages under
> § 362(k), the courts of appeal that have considered the issue, while agreeing that
> emotional distress is an available component of 'actual damages' under § 362(k), are
> divided on the standard for its award.  *See Fleet Mortg. Group, Inc. v. Kaneb*, 196
> F.3d 265 (1st Cir. 1999) (rejecting creditor's argument that mental anguish must be
> proven by "physical injury or corroborating medical testimony" and upholding
> emotional distress damages of $25,000 for violation of the automatic stay based on
> the debtor's testimony that described specific changes in his life, including change
> in eating habits, decrease in social activities, and problems with sleeping); *Aiello v.
> Providian Financial Corp.*, 239 F.3d 876, 880 (7th Cir. 2001) ("[W]e do not think
> that emotional injury is compensable under section 362(h) [now 362(k)] when there
> is no financial loss to hitch it to by means of the clean-up doctrine."); *In re Dawson*,
> 390 F.3d 1139, 1149-50 (9th Cir. 2004) (holding that financial loss is not a
> prerequisite for award of emotional distress damages and stating that although
> "fleeting or trivial anxiety or distress" is not sufficient, such damages can be awarded
> based on (1) testimony from non-experts who testify as to "manifestations of mental
> anguish and clearly establish that significant emotional harm occurred"; (2)
> corroborating medical evidence; or even (3) significant emotional distress that is
> "readily apparent even without corroborating evidence," such as where the creditor
> "engaged in egregious conduct."); *In re Repine*, 536 F.3d 512 (5th Cir. 2008) (stating
> that appellate courts should exercise "caution in affirming emotional damage awards

> because emotional damages are easier to manufacture than other types of damages"
> and vacating award when debtor did no more than set forth "generalized assertions"
> of his emotional distress in his testimony).

*In re The Original Barefoot Floors of Am., Inc.*, 412 B.R. 769, 776-77 (Bankr. E.D. Va. 2008).  The

Fifth Circuit Court of Appeals has considered with some specificity the extent of the evidence

necessary to support the award of emotional distress damages for an automatic stay violation:

> The First Circuit has held that emotional damages qualify as "actual damages" under
> section 362(k).  *See Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir.
> 1999).  The Court went on to hold that emotional damage awards under section
> 362(k) must be supported by "specific information" rather than "generalized
> assertions" and ultimately upheld the Bankruptcy Court's award because the plaintiff
> testified about specific changes in his life caused by his emotional distress, including
> sleeping problems, eating problems, and social anxiety. *See id.* at 270.  The Seventh
> Circuit implicitly endorsed *Fleet Mortg.*'s specificity requirement but went further,
> holding that emotional injury is not compensable under section 362(k) unless the
> emotional injury can be linked to some other financial injury.   *See Aiello v.
> Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir. 2001).  In so doing, the Court
> observed that "the law has always been wary of claims of emotional distress" and
> that the Bankruptcy Courts are ill-suited to assess such claims. *See id.* at 879-80.
> We share the Seventh Circuit's caution in affirming emotional damage awards
> because emotional damages are easier to manufacture than other types of damages.
> *See id.*
>
> We agree that, at minimum, Repine was required to set forth "specific
> information" concerning the damages caused by his emotional distress rather than
> relying only on "generalized assertions."  *See Fleet Mortg.*, 196 F.3d at 269.
> However, we need not adopt a precise standard for whether, or under what
> circumstances, a court may award emotional damages under section 362(k) because
> we find that Repine has not made this minimal showing.  With respect to his alleged
> emotional damages, Repine testified that he felt "very upset" at what his sons would
> think of him for being in jail.  He also testified that it was "very traumatic" for him
> to miss his father's funeral, that he still had dreams about it, that it came to mind
> when he interacted with people in the community who knew he missed the funeral,
> and that he may never get over it.  We do not doubt Repine's testimony, but these
> generalized assertions are insufficient to support an emotional damages award under
> section 362(k).  *See Fleet Mortg.*, 196 F.3d at 269.  And the fact that Repine's
> emotional injury was accompanied by financial loss cannot cure this deficiency. *See
> Aiello*, 239 F.3d at 880.  Accordingly, we vacate the Bankruptcy Court's emotional
> damages award.

*Young v. Repine* (*In re Repine*), 536 F.3d 512, 521-22 (5th Cir. 2008).

A number of courts within the Fourth Circuit have awarded damages for emotional distress incurred by reason of a stay violation. *See Green Tree Servicing, LLC v. Taylor* (*In re Taylor*), 369 B.R. 282, 288-89 (S.D. W. Va. 2007) (affirming bankruptcy court's award of emotional distress damages to compensate debtor for fear, emotional trauma, and stress that triggered debtor's pre-existing medical condition as a result of two separate stay violations by same creditor); *Weatherford v. Tinmark* (*In re Weatherford*), 413 B.R. 273, 289 (Bankr. D.S.C. 2009) (finding that, although the debtor did not present evidence of a medical injury, "she did present credible and convincing testimony indicating that she suffered from anxiety and depression as a result of" the stay violation (which included continued collection efforts and retention of property of the estate) that "requir[ed] medication and counseling," and awarding $1,000.00 for emotional distress damages); *Lofton v. Carolina Fin., LLC* (*In re Lofton*), 385 B.R. 133, 141 (Bankr. E.D.N.C. 2008) (awarding $1,500.00 in emotional distress damages for "tension, anger, worry and disruption" suffered by debtor due to creditor's willful violation of automatic stay by commencing small claims court action against the debtor despite receiving notice of the bankruptcy filing, even though suit was dismissed immediately upon receipt of debtor's adversary complaint); *Covington v. I.R.S.* (*In re Covington*), 256 B.R. 463, 467 (Bankr. D.S.C. 2000) (awarding $1,000.00 in emotional distress damages for emotional injury and trauma caused to debtors and their children by stay violation); *In re Carrigan*, 109 B.R. 167, 171-72 (Bankr. W.D.N.C. 1989) (awarding emotional distress damages where creditor appeared at debtors' home at 9:00 p.m. on a Sunday night demanding payment in a harassing and abusive fashion, leading debtors to experience anxiety, fear, stress, and humiliation).  Certain of the courts within this circuit that have considered an award of damages for emotional distress in the context

of an automatic stay violation have required that a debtor experience significant harm and a causal

connection between the harm and the violation of the automatic stay. *In re Taylor*, 369 B.R. at 288

("While claims for fleeting or trivial emotional distress are not compensable, an individual who

suffers significant harm and demonstrates a causal connection between the harm and the violation

of the automatic stay is entitled to be compensated.") (citing *Dawson v. Washington Mut. Bank, F.A.*

(*In re Dawson*), 390 F.3d 1139, 1146-48 (9th Cir. 2004); *Aiello v. Providian Fin. Corp.*, 239 F.3d

876, 880 (7th Cir. 2001); *Fleet Mortg. Grp., Inc. v. Kaneb*, 196 F.3d 265, 269-70 (1st Cir. 1999));

*see also In re Robinson*, No. 06-10618-SSM, 2008 WL 4526183, at *4 (Bankr. E.D. Va. Sept. 29,

2008) (unreported decision) (citing *In re Taylor*, 369 B.R. at 288).

Segregating the emotional distress experienced by a debtor from the automatic stay violation

from other stress sources may be problematic. *In re Robinson*, 2008 WL 4526183, at *4 ("[E]ven

though emotional distress damages may be recoverable for violations of the automatic stay, the court

declines to do so here, because there is simply no way of parsing out that portion of the distress

occasioned by the inclusion of prepetition charges on the invoices from those resulting simply from

being invoiced."). Judge Jones has well-described the considerations of a court weighing the award

of emotional distress damages for an automatic stay violation:

> To be entitled to emotional distress damages under § 362(k)(1), an individual
> must: "(1) suffer significant harm, (2) clearly establish the significant harm, and (3)
> demonstrate a causal connection between that significant harm and the violation of
> the automatic stay (as distinct, for instance, from the anxiety and pressures inherent
> in the bankruptcy process)." "Fleeting or trivial anxiety or distress does not suffice
> to support an award; instead, an individual must suffer significant emotional harm."
> An individual must establish that he or she was injured by the violation to be eligible
> to claim actual damages.

> A person may establish that he or she suffered significant emotional harm in
> several ways. First, the person could offer corroborating medical evidence. Second,
> non-experts, such as family members, friends, or coworkers may testify to

28

manifestations of mental anguish.   Third, if the violator engaged in egregious
conduct, the significant emotional distress may be readily apparent without
corroborative evidence.  To illustrate, a creditor engaged in egregious conduct when
he entered the debtor's home at night, doused the lights, and pretended to hold a gun
to the debtor's head.  Fourth, even if the conduct is not egregious, the circumstances
may make it obvious that a reasonable person would suffer significant emotional
harm.  To illustrate, a debtor suffered emotional harm when she was forced to cancel
her son's birthday party because her checking account had been frozen.

*Page Ventures, LLC v. Ventura-Linenko* (*In re Ventura-Linenko*), No. 3:10-cv-138-RCJ-RAM, 2011

WL 1304464, at *9 (D. Nev. Apr. 1, 2011) (slip copy) (internal citations omitted).

    With the Fourth Circuit Court of Appeals having not yet considered this issue, it remains to

speculate what its judgment would be in this regard.  This Court believes a middle course would be

chosen:  not barring emotional distress damages without the demonstration of a causally-related

financial loss, as the Seventh Circuit Court of Appeals has ruled, *see Aiello v. Providian Financial*

*Corp.*, 239 F.3d 876, 880-81 (7th Cir. 2001), but laying out very strict requirements of proof for an

award of emotional distress damages, much as Judge Jones demanded in *In re Ventura-Linenko*,

mandating that a debtor "(1) suffer significant harm, (2) clearly establish the significant harm, and

(3) demonstrate a causal connection between that significant harm and the violation of the automatic

stay" in order to recover.  *In re Ventura-Linenko*, 2011 WL 1304464, at *9.  This course would

recognize the reality that some stay violations by the nature of their circumstances do inflict genuine

emotional distress that should be compensable but also remind that the principal purpose of § 362

(k) is to deter stay violations and to provide redress for economic injury.  Suffice it to say, caution

should be high among the guiding principles of a court in awarding compensation for emotional

distress in this context.

    Application of the foregoing principles in the instant matter presents the Court with a

dilemma.  On one hand, it is axiomatic that a debtor would experience emotional distress upon

finding some of her personal belongings unexpectedly disposed of in a trash dumpster so as to constitute an occasion where "even if the conduct is not egregious, the circumstances may make it obvious that a reasonable person would suffer significant emotional harm." *Id.* However, both the extent of emotional distress claimed to have been experienced by the Seatons and its never-ending duration are problematic to this Court. The unrequited anguish Mrs. Seaton claims simply appears to be very disproportionate to the acts of removal and disposal that occurred here. This leads the Court to ponder whether the extent of the Seatons' distress was not proximately caused by the removal and disposal of some items of their personalty but, rather, represents the cumulative stress caused by Mr. Seaton's injury, his unemployment, their son's diagnosis of illness, their bankruptcy filing, and the embarrassment of their ouster from the Apartment, none of which is causally related to any stay violation here. Accordingly, the Court finds that it is appropriate to limit the award of damages for emotional distress to what flows proximately from the acts of removal and disposal and to award emotional distress damages in the amount of $250.00. Thus, the Court finds that the Motion to Strike made by counsel for the Respondents during the hearing for insufficient evidence as to this issue should be denied.

### 5. Punitive Damages

The Seatons pray for an award of $30,000.00 in punitive damages. This Court has recently reviewed the circumstances under which courts have awarded punitive damages for a stay violation:

> In considering whether punitive damages are appropriate under the statutory authorization for an automatic stay violation under 11 U.S.C. § 362[k], courts have generally required a violation which occurs by way of egregious or vindictive conduct. *See In re Carrigan*, 109 B.R. 167, 172 (Bankr. W.D.N.C. 1989) (citing *In re Midkiff*, 85 B.R. 467 (Bankr. S.D. Ohio 1988)). Accordingly, whether expressed as "egregious conduct," "malevolent intent," or "clear disregard of the bankruptcy laws," each of these decisions appear to employ a finding of creditor conduct beyond willfulness or deliberation and more closely resembling a specific intent to violate

the discharge injunction in order to assess punitive damages.

*Rountree v. Nunnery* (*In re Rountree*), 448 B.R. 389, 419 (Bankr. E.D. Va. 2011) (quoting *Cherry v. Arendall* (*In re Cherry*), 247 B.R. 176, 186-87 (Bankr. E.D. Va. 2000)).[6]  These circumstances are not in evidence here.  There is no basis to conclude Collinswood's removal of the personal property from the Apartment was motivated other than upon Kittrell Eberwine's mistaken conclusion, based upon information received from George Eberwine to the same effect, that the Seatons had completed their move from the Apartment.  Nothing in the record suggests any vindictive, egregious, or malicious conduct on the part of the Respondents toward the Seatons or their property.  The removal and disposal of some of the Seatons' property was not undertaken in any attempt to collect rent but, rather, to place the Apartment in a condition so it could be re-let, all occurring after Kittrell Eberwine believed the Apartment to have been vacated and any property remaining there abandoned by the Seatons.  Accordingly, any award of punitive damages would be highly inappropriate.  Thus, the Court finds that the Motion to Strike made by counsel for the Respondents during the hearing for insufficient evidence as to this issue should be granted.

------

[6] Judge Copenhaver has noted the different articulations used to define the entitlement to an award of punitive damages for a stay violation in light of the lack of a uniform standard of such requirements:

> One group uses "maliciousness or bad faith" as a guide. . . . Another group of cases uses "arrogant defiance of federal law" as the touchstone. . . .

> Other courts have used egregious, vindictive or intentional misconduct as the standard . . . Still other courts have used a multi-factor approach and considered the following four factors: (1) the nature of the defendant's conduct; (2) the defendant's ability to pay; (3) the motive of the defendant; and (4) any provocation by the debtor.

*Green Tree Servicing, LLC v. Taylor* (*In re Taylor*), 369 B.R. 282, 289 (S.D. W. Va. 2007) (internal citations omitted).

6.   Attorney's Fees and Costs

The Seatons allege they should be awarded $10,378.04 in attorney's fees pursuant to 11

U.S.C. § 362(k).  Seaton Exhibit E, Invoice of Attorney's Fees and Costs.  "For Debtors to recover

attorneys' fees, however, such fees must be reasonable and necessary."  *In re Miller*, 447 B.R. 425,

434 (Bankr. E.D. Pa. 2011).  Chief Judge Craig has explained the concerns in awarding attorney's

fees in the context of an automatic stay violation:

> While attorneys' fees and costs are recoverable under § 362(k), the fees and costs
> must be reasonable and necessary.  *In re Robinson*, 228 B.R. 75, 85 (Bankr.
> E.D.N.Y. 1998).  "The policy of section 362[k], to discourage willful violations of
> the automatic stay, is tempered by a reasonableness standard born of courts'
> reluctance to foster a 'cottage industry' built around satellite fee litigation."  *Id.*
> (citing *Putnam v. Rymes Heating Oils, Inc. (In re Putnam)*, 167 B.R. 737, 741
> (Bankr. D.N.H. 1994)).  It is well established that "[r]easonable and necessary fees
> do not include unnecessary litigation costs."  *Id.*; *see also Yarinsky v. Saratoga
> Springs Plastic Surgery, PC (In re Saratoga Springs Plastic Surgery, PC )*, No.
> 1:03CV896, 2005 WL 357207, at *54 (N.D.N.Y. Feb. 11, 2005), *aff'd*, 172 Fed.
> Appx. 339 (2d Cir. 2006) ("[A]n 'excessively litigious approach' to violations of the
> automatic stay that do not cause damages in an[d] of themselves must be guarded
> against.").

*In re Prusan*, No. 09-49716-CEC, 2010 WL 813778, at *3 (Bankr. E.D.N.Y. Mar. 2, 2010)

(unreported decision).  The proportionality of the attorney's fees sought to the damages incurred by

a debtor is a significant factor in determining reasonableness.  *Rosengren v. GMAC Mortg. Corp.*,

No. CIV 00-971, 2001 WL 1149478, at *5 (D. Minn. Aug. 7, 2001) (unreported decision) ("[B]ased

on the failure of plaintiff's counsel to timely advise opposing counsel of his client's actual damages

and in light of the de minimus nature of those damages, the court will limit the award of attorney

fees in this case to $150, which reflects the court's estimation of the limited legal work required to

dispose of this matter short of litigation."); *Mosher v. Evergreen Mgmt., Inc. (In re Mosher)*, 432

B.R. 472, 477 (Bankr. D.N.H. 2010) ("Considering that there are no other actual damages in this

case and the violation concerned approximately $620, the Court finds that [debtor's counsel]'s projected amount of 23.8 hours spent on this case is unreasonable."); *In re Price*, 179 B.R. 70, 73 (Bankr. S.D. Ohio 1995) (limiting fee award to $75.00 where legal fees and judicial time far exceeded the $13.00 in actual damages); *Putnam v. Rymes Heating Oils, Inc.* (*In re Putnam*), 167 B.R. 737, 741 (Bankr. D.N.H. 1994) ("[T]he amount of the costs and attorneys' fees [$6,168.00 in attorneys' fees and $718.70 in costs] has no relationship to the amount of actual damages suffered by the Plaintiffs ($248.16) or the value of the gas in the tank removed (less than $329.00)."); *but see Am.'s Servicing Co. v. Schwartz-Tallard*, 438 B.R. 313, 321 (D. Nev. 2010) ("Appellee must prove how much she expended or was charged in attorney's fees as a measure of her actual damages, but the statute does not require that she prove her damages were 'reasonable.'").

"In appropriate circumstances, a court may determine that a motion made pursuant to § 362(k) was wasteful and limit the attorney's compensation award to the amount that he would have earned had he handled the matter efficiently." *In re Robinson*, 228 B.R. 75, 86 (Bankr. E.D.N.Y. 1998). Those circumstances include where "'the injury caused and damages incurred, other than attorneys' fees, only amount to the cost of appearing in court to litigate the contempt motion; the burden of requiring the debtor's attorney to notify the creditor of the violations is insignificant; and no bad faith on the part of the defendant exists.'" *Id.* (citing *Price v. Pediatric Academic Assoc., Inc.*), 175 B.R. 219, 222 (S.D. Ohio 1994)).

The Court finds that the attorney's fees sought by the Seatons are grossly disproportionate to the actual damages sustained by reason of the stay violation here. The attorney's fees and costs prayed for by the Seatons total $10,378.04, whereas the actual damages for the loss of property *claimed* by the Seatons are, at most, $2,013.00. *See* Appendix A. In other words, the property

33

damages sought equal 19.74% of the total attorney's fees requested ($10,200.00), and, of course,

no amount has actually been *awarded* here for the loss of personalty because of the issues of proof

expounded on previously.  This matter well-illustrates the concerns voiced by other courts of

fostering a "'cottage industry' built around satellite fee litigation."  It is significant as well that the

Seatons' counsel managed to incur over $10,000.00 in attorney's fees without conducting any

discovery and incurred $8,700.00 in attorney's fees *before* the hearing on the Sanctions Motion was

held.  Furthermore, the billing rate applied by the Seatons' counsel of $300.00 per hour for time

expended outside of court and $400.00 per hour for time expended in court is very high for this

geographic region and significantly in excess of the hourly billing rates typically approved by this

Court in consumer bankruptcy matters.  Additionally, counsel for the Seatons advised the Court he

employs no attorneys at a lower billing rate nor any paralegals in his firm; therefore, he asserts he

should be compensated for all time expended by him on this matter regardless of whether the task

could have been delegated to a lower hourly rate billing attorney or paraprofessional, as would have

been the case in most law offices.  Simply put, for these many reasons, the monies sought by the

Seatons in attorney's fees and costs are highly unreasonable.  Inasmuch as the ratio of the attorney's

fees sought to the emotional distress damages awarded ($250.00) is 2.45%, the Court finds that it

is appropriate to award attorney's fees in the amount of 2.45% of the fees prayed for, or $249.90.

The Court further finds that it is appropriate to award the Seatons all of the costs incurred in this

matter in the amount of $178.04.  As such, the Court finds that the Motion to Strike made by counsel

for the Respondents during the hearing for insufficient evidence as to the reasonableness of the

attorney's fees should be denied.

34

## IV.  Summary

For the reasons set forth herein, the Court finds the Motion for Contempt and the Motion for Sanctions should be granted in part and denied in part.  The Court finds that Collinswood Lake Apartments, LLC, George Eberwine, and Kittrell Eberwine jointly and severally caused a willful violation of 11 U.S.C. § 362(k) against the Seatons.  The Court finds that the Seatons request for damages for the Missing Items or the Retrieved Items should be denied *en toto*.  The Court further finds that the Seatons should be awarded $250.00 for emotional distress damages, attorney's fees in the amount of $249.90, and costs in the amount of $178.04.

A separate Order will be entered granting in part and denying in part the Motion for Contempt and the Motion for Sanctions.

The Clerk is ordered to forward a copy of this Memorandum Opinion to Taylor D. Boone, counsel for the Seatons; to David A. Greer, counsel for Collinswood Lake Apartments, LLC, George Eberwine, and Kittrell Eberwine; and to Debera F. Conlon, Assistant United States Trustee.

Entered at Norfolk in the Eastern District of Virginia on this 28th day of November, 2011.

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

In re: Robert Edward Seaton, Jr. & Sarah Nichole Seaton    APPENDIX A
Case No. 11-71142-SCS    (page 1 of 2)

**Alleged Property Damage**

| _Items in Dumpster_ | Plaintiffs'<br>Exhibit G | Plaintiffs'<br>Exhibit I |
|---|---|---|
| Pictures of Son | $ 250.00 | $ - |
| | | |
| Food from Pantry | $ 150.00 | |
| Farm Fresh grocery store (online) | | $ 341.63 |
| | | |
| 4 Queen-Sized Sheets | $ 80.00 | |
| Home Stripe Sheet Set - Tan (Queen): $43.99 x 2 (target.com) | | $ 87.98 |
| | | |
| Shoe Holder | $ 40.00 | |
| ClosetMaid 15 Unit Organizer White (target.com) | | $ 24.99 |
| | | |
| 14 Pairs of Shoes | $ 250.00 | |
| Men's William Comfort Dress Shoes (walmart.com) | | $ 22.00 |
| Women's Lara Comfort Start Shoes (walmart.com) | | $ 12.00 |
| Women's Tutu Flip Flops (GUESS.com) | | $ 35.00 |
| Women's Sandals (babyphat.com) | | $ 39.00 |
| Women's White Rhinestone Hood Sandals (ShopJustice.com) | | $ 19.99 |
| Women's Unionbay Sparkle Flip Flops (BeallsFlorida.com) | | $ 15.00 |
| Girl's Arizona Lucy Girls Shoe (JCPenney.com) | | $ 19.99 |
| Women's Faux-Leather Thong Sandals (oldnavy.gap.com) | | $ 10.97 |
| Women's Printed Flip-Flops (oldnavy.gap.com) | | $ 3.50 |
| _Subtotal_ | | $ 177.45 |
| | | |
| Mrs. Seaton's Baby Clothes | $ - | |
| Feltman Brothers Boy's Day Gown w/ Train (thevelveteenrabbit.com) | | $ 39.99 |
| 3-Piece Sweater Set (ABCrochetedCreations via etsy.com) | | $ 35.00 |
| Circo Comforter - Patchwork w/ Ruffles (amazon.com) | | $ 59.99 |
| _Subtotal_ | | $ 134.98 |
| | | |
| Mrs. Seaton's Father's Baby Cowboy Boots | $ - | |
| Vintage Toddlers Cowboy Boots (rubylane.com) | | $ 70.00 |
| | | |
| Afghan Blanket and Crocheted Table Topper | $ - | |
| White w/ Dark Red Stripes Throw (from cozycrafters via etsy.com) | | $ 60.00 |
| GrandMa Delight CenterPiece (from BittnersCreations via etsy.com) | | $ 55.00 |
| _Subtotal_ | | $ 115.00 |
| | | |
| Miscellaneous Documents | $ 408.00 | $ - |
| | | |
| Ceramic Santa Claus Cookie Jar | $ 20.00 | |
| Santa Claus Cookie Jar (blujay.com) | | $ 24.95 |
| | | |
| Hurricane Globe | $ 20.00 | $ - |
| | | |
| **Total re: Items in Dumpster** | **$ 1,218.00** | **$ 976.98** |

In re: Robert Edward Seaton, Jr. & Sarah Nichole Seaton
Case No. 11-71142-SCS

Case 11-71142-SCS    Doc 50    Filed 11/28/11    Entered 11/28/11 12:17:02    Desc Main
Document    Page 37 of 37

APPENDIX A
(page 2 of 2)

**Alleged Property Damage**

| Missing Items | Plaintiffs' Exhibit G | Plaintiffs' Exhibit J |
|---|---|---|
| Antique Picture #1 | $ 250.00 | |
| Antique Sleepy Dreamy Baby Print in Ornate Gold Frame (ebay.com) | | $ 84.99 |
| Antique Picture #2 | $ - | |
| Vintage Annie Benson Muller Framed Print by Turner Mfg (from OpheliaVintageHome via etsy.com) | | $ - |
| Party Gals Tote and Contents | $ 250.00 | |
| Latch Box Set of Six - Pink (target.com) | | $ 39.99 |
| Starter Kit: 15 Ultra Chic Toys; 24 Lotions & Potions; 9 Fun Accessories; 14 Sensual Accessories; Party Gal Catalogs; Order Forms; Recruiting Presentation; Product Bags (partygals.biz) | | $ 250.00 |
| *Subtotal* | | $ 289.99 |
| Hard Hat w/ Light | $ 45.00 | |
| MSA Comfo-Cap Mining Hard Hat w/ Staz-On Suspension (coopersafety.com) | | $ 45.95 |
| 2 Pairs of Work Boots | $ 150.00 | |
| Timberland Pro Men's . . . Alloy Safety Toe Boot (sears.com) | | $ 124.99 |
| Desert Tan - Panama Sole Military Speedlace Jungle Boots (Leather) 8" (galaxyarmynavy.com) | | $ 42.99 |
| *Subtotal* | | $ 167.98 |
| Quilt | $ 100.00 | |
| Queen Quilt Set Shabby Patchwork Vintage Pink Rose Chic (bonanza.com) | | $ 199.95 |
| **Total re: Missing Items** | **$ 795.00** | **$ 755.54** |
| **Total** | **$ 2,013.00** | **$ 1,732.52** |